| | | |
|---|---|---|
| **K.** | EL COMERCIO, *Eight criminal gangs are considered 'terrorists' in Ecuador*, Available at https://www.elcomercio.com/actualidad/seguridad/ocho-bandas-criminales-consideradas-terroristas-ecuador.html (Last accessed: October 17, 2024). | **104** |
| **L.** | InSight Crime, *Los Lagartos*, https://es.insightcrime.org/noticias-crimen-organizado-ecuador/los-lagartos/ (Last accessed: October 17, 2024) | **108** |
| **M.** | EL COMERCIO, *Ecuador and Peru plan joint security operations at the border*, Available at https://www.elcomercio.com/actualidad/seguridad/ecuador-peru-operaciones-seguridad-frontera.html (Last accessed: October 17, 2024). | **114** |
| **N.** | CNN EN ESPAÑOL, *The explosion of insecurity in Ecuador responds to Lasso's lack of leadership, according to former police commander*, Available at Available at https://cnnespanol.cnn.com/video/explosion-inseguridad-ecuador-falta-liderazgo-lasso-policia-fernando-del-rincon-conclusiones-cnne/ (Last accessed: October 17, 2024). | **117** |
| **O.** | LA HORA, *25 criminal groups, from nine criminal organizations, corner Ecuador*, Available at https://www.lahora.com.ec/pais/25-grupos-delictivos-nueve-organizaciones-criminales-arrinconan-ecuador/ (Last accessed: October 17, 2024). | **120** |
| **P.** | PRIMICIAS, *Cuenca endures a wave of organized assaults in residential areas,* Available at https://www.primicias.ec/noticias/sociedad/cuenca-ola-asaltos-zonas-residenciales/ (Last accessed: October 17, 2024). | **127** |
| **Q.** | CNN EN ESPAÑOL, *OPINION* \| *Insecurity passes an ultimatum to Ecuador*, Available at Available at https://cnnespanol.cnn.com/2022/09/19/opinion-la-inseguridad-le-pasa-un-ultimatum-a-ecuador/ (Last accessed: October 17, 2024). | **135** |
| **R.** | LA HORA, *Justice officials are under threats and little protection*, Available at https://www.lahora.com.ec/pais/funcionarios-de-justicia-estan-bajo-amenazas-y-poca-proteccion/ (Last accessed: October 17, 20244). | **139** |
| **S.** | PRIMICIAS, *Los Lobos handle micro-trafficking from prison on the streets of Cuenca,* Available at https://www.primicias.ec/noticias/en-exclusiva/lobos-controlan-microtrafico-azuay/ (Last accessed: Jan 19, 2024). | **146** |
| **T.** | GK, *Who are Los Lobos?,* Available at https://gk.city/2021/10/21/quienes-son-los-lobos/ (Last accessed October 17, 2024). | **159** |
| **U.** | PRIMICIAS, *The Choneros and Lobos begin to become drug trafficking cartels*, Available at https://www.primicias.ec/noticias/en-exclusiva/grandes-bandas-nuevos-carteles-ecuador-narcotrafico/ (Last accessed: October 17, 202424). | **162** |

EOIR — 3 of 172

# EXHIBIT A

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYC


Reconocid.. por ................................................
........................................ mediante .............
.............................. con fecha ...............
........................................ cuya copia se archiva.
..........................., .... de ............... de 19...
f.) ........................................
**Jefe de Oficina**

---

Legitimad.. por sus padres ...............................
........................................ mediante matrimonio celebrado en la Oficina de ..............................
................. con fecha ...............................
e inscrito en el tomo......... pág. ......... acta ........
..........................., .... de ............... de 19...
f.) ........................................
**Jefe de Oficina**

---

Contrajo matrimonio con ........................................
........................... en la Ofc. de ...............
.......................... con fecha ...................
e inscrito en el tomo ......... pág. ......... acta ........
..........................., .... de ............... de 19...
f.) ........................................
**Jefe de Oficina**

---

Falleció el ..... de ........................ de 19 ..... y su defunción consta inscrita en la Ofc. de ....................
................. en el tomo ...... pág. ...... acta ......
..........................., .... de ............... de 19...
f.) ........................................
**Jefe de Oficina**

---

**OTRAS SUBINSCRIPCIONES O MARGINACIONES**

........................................................................
........................................................................
........................................................................
........................................................................
........................................................................
........................................................................
........................................................................
........................................................................
........................................................................

**REPUBLICA DEL ECUADOR**
**DIRECCION GENERAL DE REGISTRO CIVIL, IDENTIFICACION Y CEDULACION**

# INSCRIPCION DE NACIMIENTO

Tomo ...1... Pág. ...33... Acta ...33...

En ......6 Ü E L...... provincia de L.......... ...AZUAY......., hoy día ..OCHO........ de ..AGOSTO........ de mil novecientos OCHENTA Y NUEVE.., el que suscribe, Jefe de Registro Civil, extiende la presente acta de inscripción del nacimiento de:

NOMBRES: MARCIA ELIZABETH... APELLIDOS: ASTUDILLO TORRES..

SEXO: ..FEMENINO....., FECHA DE NACIMIENTO: 28 DE JULIO DE 1989....

LUGAR: ..6 Ü E L..... de Cantón ..SIGSIG....... Provincia ..AZUAY.....

NOMBRES Y APELLIDOS DEL PADRE: ANGEL BACILIO ASTUDILLO TELLO.

de nacionalidad .ECUATORIANA..., de estado ...CASADO....., con Cédula de Identidad Nº 010264537-1.

NOMBRES Y APELLIDOS DE LA MADRE: ROSA UBALDINA TORRES LITUMA.

de nacionalidad .ECUATORIANA.., de estado ....CASADA...., con Cédula de Identidad Nº 170992144-6..

Solicitó esta inscripción ........ EL PADRE .......................... con Cédula de Identidad Nº ................. de ............................ años de edad, de profesión ............................... de nacionalidad ..................., quién hace constar, además, que LOS PADRES SON CASADOS ENTRE SI..........
........................................................................

---

**OBSERVACIONES:**

........................................................................
........................................................................
........................................................................
........................................................................
........................................................................
........................................................................

FIRMAS:

EOIR — 5 of 172

| | |
|---|---|
| Recognized by.....by.................dated.............<br>....a copy of which is filed.................of..........of 19................<br>f)<br>Chief of Office | REPUBLIC OF ECUADOR<br>General Direction of Civil Registry, Identification and Card<br>INSCRIPTION OF BIRTH Volume 1 Page 33 Act 33<br>In…….. GUEL……..province of ………Azuay………………..present day ..eight ….of…August……of one thousand nine hundred…eighty…nine……, the undersigned, Chief of the Civil Registry, extends the present certificate of inscription of birth of:<br><br>NAMES: MARCIA ELIZABETH....LAST NAMES: ASTUDILLO TORRES…<br>SEX: Femenine… DATE OF BIRTH: 28 of JULY of 1989……<br>PLACE: GUEL…….. Canton ….SIGSIG....province of ..AZUAY… |
| Legitimized by his parents....... through marriage celebrated in the Office of....... dated...... and registered in volume ....... page......... minutes........, of........ Of...19…<br>f)<br>Chief of Office | NAMES AND LAST NAMES OF THE FATHER:.ANGEL BACILIO ASTUDILLO TELLO…<br>Of nationality …ECUADORIAN……. of civil status....MARRIED…….Identification Card No. 0102645371<br>NAMES AND LAST NAMES OF THE MOTHER: ROSA UBALDINA TORRES LITUMA…….. of nationality…ECUADORIAN…….., of civil status…MARRIED………, with. identification card No. 1709921446 |
| Contracted marriage with……… in the ofc…… Of…….with date ………And inscribed in ……..volume….. page… act… of….. of ….<br>f)<br>Chief of Office | Requested this inscription: The father Identification card No…………………..of……… ………………years old, of profession……………………………of nationality……… who states that in addition……. the parents are married to each other………………… |
| Passed away....of...of 19. And Death is registered in ……….the…. of…… of. in volume...page...act. of. ……of……<br>f).<br>Chief of Office | OBSERVATIONS:<br>…………………………………………………………………………………<br>…………………………………………………………………………………<br>…………………………………………………………………………………<br>………………………………………………………………………………… |
| OTHER SUBINSCRITIONS OR MARGINATIONS | Signature:<br>(SIGNATURE) (SIGNATURE) |

# AFFIDAVIT OF TRANSLATION

STATE OF NEW YORK }
ss:
COUNTY OF WESTCHESTER }

Ana Lara, being duly sworn, hereby deposes and says:

1. I am fluent in both English and Spanish languages, and I am able to speak, write, read and interpret from Spanish to English.
2. Spanish is my native language and I learned English at a young age. I was awarded Cambridge's First Certificate in English at the age of 17.
3. I am competent to translate and interpret from Spanish language into English to the best of my knowledge.
4. My qualifications stem from twenty-two years of practicing speaking, writing, reading, interpreting, and translating from the English to Spanish languages, as well as studying both Spanish and English throughout my life, from preschool to college, honing my writing and speaking skills.
5. The translation provided herein is accurate and corresponds to the annexed document.

Dated: White Plains, New York
October, 16th, 2024

Ana Lara
Soto Law, PLLC
445 Hamilton Ave, Suite 407
White Plains, New York 10601

Sworn before me on

16th, day of October, 2024

Notary Public

ASHLEY NUNEZ
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01NU0026203
Qualified in Westchester County
Commission Expires June 26, 2028

EOIR — 7 of 172

**REPÚBLICA DEL ECUADOR**
Dirección General de Registro Civil, Identificación y Cedulación

Dirección General de Registro Civil, Identificación y Cedulación

**REPÚBLICA DEL ECUADOR**
Dirección General de Registro Civil, Identificación y Cedulación

# INSCRIPCIÓN DE NACIMIENTO

## REGISTRO ORIGINAL

**Número de registro:** N - 260 - 000009 - 38
**Número de cédula:** 0150014157

En **ECUADOR**, provincia de **AZUAY**, cantón **CUENCA**, parroquia **SAN BLAS**, el día de hoy, **6 DE JUNIO DE 2011**, el que suscribe, Jefe de Registro Civil, extiende la presente acta de inscripción de nacimiento de:

NOMBRES: **PAULO ANDRES** APELLIDOS: **TORRES ASTUDILLO** SEXO: **MASCULINO**

LUGAR Y FECHA DE NACIMIENTO: **ECUADOR**, Provincia del **AZUAY**, cantón **CUENCA**, parroquia **HERMANO MIGUEL**, el día **9 DE MAYO DE 2011**.

NOMBRES Y APELLIDOS DEL PADRE: **RAUL ELIDIO TORRES ALTAMIRANO** con cédula/pasaporte No. **0105382162** de nacionalidad **ECUATORIANA**, de estado civil **SOLTERO**.
NOMBRES Y APELLIDOS DE LA MADRE: **MARCIA ELIZABETH ASTUDILLO TORRES**, con cédula/pasaporte No. **0104992268** de nacionalidad **ECUATORIANA**, de estado civil **SOLTERA**.

Nombres y Apellidos de quien solicita la inscripción: **RAUL ELIDIO TORRES ALTAMIRANO**, cédula/pasaporte No. **0105382162**, nacionalidad **ECUATORIANA**.

## OBSERVACIONES

**PADRES PRESENTES SOLICITAN INSCRIPCION/ PADRES SOLTEROS**

| | |
|---|---|
| Firma de la Madre | Firma del Padre |
| MARCIA ELIZABETH ASTUDILLO TORRES | RAUL ELIDIO TORRES ALTAMIRANO |
| Firma del Delegado | Firma del Solicitante |
| CHRISTIAN ORLANDO SALINAS PATIÑO | RAUL ELIDIO TORRES ALTAMIRANO |

Lugar y Fecha de Nacimiento:
**CUENCA, 9 DE MAYO DE 2011**

**OPORTUNO**

Impreso por: CSALINAS, CUENCA, 6 DE JUNIO DE 2011

000003884038

Archivo Provincial AZUAY

Información certificada a la fecha: 17 DE MARZO DE 2022
Emisor: GUAMAN OCHOA KATHERINE ANDREA

N° de certificado: 223-691-31097

223-691-31097

Ing. Fernando Alvear C.
Director General del Registro Civil, Identificación y Cedulación
Documento firmado electrónicamente

EOIR — 8 of 172



...este certificado deberá validarlo en: https://virtual.registrocivil.gob.ec, conforme a la LOGIDAC Art. 4, numeral 1 y a la LCE.

(ECUADOR FLAG)REPUBLIC OF ECUADOR (LOGO)
General Directorate of Civil Registry, Identification and Cedulation

(ECUADOR FLAG)REPUBLIC OF ECUADOR
General Directorate of Civil Registry, Identification and Cedulation

**BIRTH REGISTRATION**
**ORIGINAL RECORD**

Registration number: N.260-000009-38
ID number: 0150014157

In **ECUADOR** province of **AZUAY** canton **CUENCA**, parish **SAN BLAS**; Today, **JUNE 6, 2011**, the undersigned, Head of Civil Registry, extends this birth registration certificate of:

NAMES: **PAULO ANDRÉS** SURNAME: **TORRES ASTUDILLO** SEX: **MALE**

PLACE AND DATE OF BIRTH: **ECUADOR**, Province of **AZUAY**, canton **CUENCA**, parish **HERMANO MIGUEL**, on **MAY 9,2011**

NAMES AND SURNAMES OF THE FATHER: **RAUL ELIDIO TORRES ALTAMIRANO**, with ID/passport No. **0105382162** nationality **ECUADORIAN**, marital status **SINGLE**.
NAMES AND SURNAMES OF THE MOTHER: **MARCIA ELIZABETH ASTUDILLO TORRES**, with ID/passport No. **0104992268** nationality **ECUADORIAN**, marital status **SINGLE**.

Names and surnames of those requesting registration: **RAUL ELIDIO TORRES ALTAMIRANO** with ID/passport No. **0105382162** nationality **ECUADORIAN**

**OBSERVATIONS**
PARENTS PRESENT REQUEST REGISTRATION/SINGLE PARENTS

(SIGNATURE)
SIGNATURE OF THE MOTHER
**MARCIA ELIZABETH ASTUDILLO TORRES**

(SIGNATURE)
SIGNATURE OF THE FATHER
**RAUL ELIDIO TORRES ALTAMIRANO**

(SIGNATURE).
SIGNATURE OF THE DELEGATE.
**CHRISTIAN ORLANDO SALINAS PATINO**

(SIGNATURE)
SIGNATURE OF APPLICANT
**RAUL ELIDIO TORRES ALTAMIRANO**

**Place and Date of Birth**
CUENCA, MAY 9, 2011

**PROMPT(BAR CODE)**
Printed by: C.SALINAS CUENCA, JUNE 6,2011

Information certified to date: MARCH 17,2022
Issuer: GUAMAN OCHOA KATHERINE ANDREA (QR CODE)
No. of Certificate: 223-691-31097
[Bar Code]
223-691-31097

Ing. Fernando Alvear
General Director of the Civil Registry, Identification and Certification
Electronically signed document

EOIR — 9 of 172

# AFFIDAVIT OF TRANSLATION

STATE OF NEW YORK }
ss:
COUNTY OF WESTCHESTER }

Ana Lara, being duly sworn, hereby deposes and says:

1. I am fluent in both English and Spanish languages, and I am able to speak, write, read and interpret from Spanish to English.
2. Spanish is my native language and I learned English at a young age. I was awarded Cambridge's First Certificate in English at the age of 17.
3. I am competent to translate and interpret from Spanish language into English to the best of my knowledge.
4. My qualifications stem from twenty-two years of practicing speaking, writing, reading, interpreting, and translating from the English to Spanish languages, as well as studying both Spanish and English throughout my life, from preschool to college, honing my writing and speaking skills.
5. The translation provided herein is accurate and corresponds to the annexed document.

Dated: White Plains, New York
October, 15th, 2024

[signature]

Ana Lara
Soto Law, PLLC
445 Hamilton Ave, Suite 407
White Plains, New York 10601

Sworn before me on

15th, day of October, 2024

[signature]

Notary Public

ASHLEY NUNEZ
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01NU0026203
Qualified in Westchester County
Commission Expires June 26, 2028

# EXHIBIT B

3

A9565929

OBSERVACIONES/REMARKS/OBSERVATIONS

A9565929

PASAPORTE
PASSPORT



Tipo/ Type: P
Código del país/ Country code: ECU
Núm. de pasap./ Passport number: A9565929
Apellidos/ Surnames: ASTUDILLO TORRES
Nombres/ Given names: MARCIA ELIZABETH
Nacionalidad/ Nationality: ECUATORIANA / ECUADORIAN
Fecha de nacimiento/ Date of birth: 28 JUL / JUL 1989
Núm. personal/ Personal number: 0104992268
Sexo/ Sex: F
Lugar de nacimiento/ Place of birth: SIGSIG, ECU
Fecha de expedición/ Date of issue: 17 MAY / MAY 2023
Autoridad/ Authority: DIGERCIC
NAT/CAN: 915613
Fecha de caducidad/ Date of expiry: 17 MAY / MAY 2033
Firma del titular/ Holder's signature

A1797743

P<ECUASTUDILLO<TORRES<<MARCIA<ELIZABETH<<<<<
A9565929<9ECU8907286F3305175010499226 8<<<<92

A9566010

OBSERVACIONES/REMARKS/OBSERVATIONS

3

A9566010

REPÚBLICA DEL ECUADOR

PASAPORTE
PASSPORT



Tipo/ Type
P

Código del país/ Country code
ECU

Núm. de pasap./ Passport number
A9566010

Apellidos/ Surnames
TORRES ASTUDILLO

Nombres/ Given names
PAULO ANDRES

Nacionalidad/ Nationality
ECUATORIANA / ECUADORIAN

Fecha de nacimiento/ Date of birth
09 MAY / MAY 2011

Núm. personal/ Personal number
0150014157

Sexo/ Sex
M

Lugar de nacimiento/ Place of birth
CUENCA, ECU

Fecha de expedición/ Date of issue
17 MAY / MAY 2023

Autoridad/ Authority
DIGERCIC

NAT/ CAN
923649

Fecha de caducidad/ Date of expiry
17 MAY / MAY 2033

Firma del titular/ Holder's signature
Paulito :) A1797825

P<ECUTORRES<ASTUDILLO<<PAULO<ANDRES<<<<<<<<<
A9566010<9ECU1105094M3305175015001415 7<<<<46

# EXHIBIT C

# AFFIDAVIT

STATE OF NEW YORK }
ss:
COUNTY OF WESTCHESTER }

Marcia Elizabeth Astudillo Torres, being duly sworn, hereby deposes and says:

1. My name is Marcia Elizabeth Astudillo Torres.
2. I was born in Sigsig, Ecuador on July 28, 1989.
3. I have been residing at 76 Putnam Avenue, Port Chester, New York 10573 since June 2024 with my son Paulo Andrés Torres Astudillo, born on May 9, 2011 in Cuenca, Ecuador.
4. I fled to the United States seeking safety for me and my child.
5. In 2010, after I became pregnant with my child, I moved in with his father, Raul Elidio Torres Altamirano, who I was dating at the time. Shortly after, I discovered he did not wish to give up his ways of going out partying and drinking.
6. My partner always drank and went out during the weekends, then he would return home and verbally and physically abuse me. On one occasion, when my son was seven (7) months old, he hit me, broke my nose and sent me to the hospital. I never reported him to the police as he was the father of my child. This was constant behavior with him, I feared every weekend, as I knew he would go out drinking and come back wanting to hurt me. He would sometimes even show up at my work, to control me and made sure I had no friends. He was very possessive. He would even hurt his own mother when she tried to defend me.
7. My partner did not work or supported me. I was the one that supported our household. When my son was about five (5) years old I found little bags with white powder in his

EOIR — 15 of 172

pants. At the time I did not know what it was, and I threw it away and he hit me because of it. Later, my partner's brother told me that Raul was consuming drugs.

8. When my child was eight (8) years old, my partner and I separated. I also sought psychological help and that is when I realized how dangerous my situation was, as well as the damage and trauma that was being inflicted on my son. His teacher even contacted me and informed me my son told her about how his father hit me. One day in 2018, my partner left to look for work, and disappeared for about three (3) days. Later I received a called from him, he was drunk, and I told him this cannot go on, he said he would not be giving up alcohol so I told him this was it, he would no longer be able to see me or my child, he then replied aggressively and told me to do whatever I wanted.

9. About two years later, in 2020, Raul's mother called me, telling me Raul was in the verge of death, as Raul had been in the fight with the people that provided him the drugs, he owed them money, so they stabbed Raul. Raul's mother called me begging for me to take my son to see his father as a final goodbye. I did not take my child to see his father, as I spoke this with my psychologist, and she told me that could traumatize my child further.

10. In February of 2024, I started getting calls to my work, the first one was to the landline, they asked for me and asked whether I worked there and until what time. Since I was receptionist, I was the one to take the call and asked them what they needed and how I could help them, but they insisted on speaking with "Marcia" and asked questions about me and my son, so I told them they were speaking to her and they hung up. After this they also acquired the office WhatsApp and contacted the company again trying to get information about me and my child. They knew my child's name and it terrified me. I tried to call back, but it said anonymous, I could not see a number. They called me a second time to the

cellphone number of the office. I had refused to provide information so they told me they called me from Turi, where a prison is located in Ecuador, and told me they would kill me whenever they wanted, as they had contacts everywhere and knew everyone at my office.

11. At this point, I became terrified with the threat, so I hung up. Later that night I was informed by my brother that Raul was being hunted by dangerous people from a drug mafia in Azuay, I believe it was his drug dealers, because he owed large amounts of money. I connected that with the calls I had received and became very concerned.

12. In March of 2024, my son told me he felt people were following him, I asked him why he thought that, and he said that outside of the school there was a man looking only at him, and that the next day the same man had been there. After he told me this, I told my father to please pick him up, as I did not want my child to be in the street alone. When my father came back from getting my son, he confirmed a man had been there. My father went to pick him up multiple days after that and after a few times they stopped showing up. Toward the end of march, my father could no longer pick him up from school after his taekwondo training, but my son wanted to keep going, so I spoke with a police officer and they told me I had to request it before the cantonal board with evidence, but I did not have any. Because of this I decided to not allow my son to go to his training anymore.

13. During the first week of April of 2024, I tried to contact anyone in Raul's family to inform them of what was happening, but they were not in Cuenca anymore, I found this out through an aunt of Raul, which made me even more wary. Halfway through April a man came into my work place, he seemed like a homeless drug addict, and he said to me "you know you need to give me money and you know why". This man identified himself as a member of a drug mafia from Azuay, the same mafia I had received the prior threats from.

EOIR — 17 of 172

A coworker came out and told him we did not have money, so he pointed to me and said "not you, her", my boss heard what was going on and came out and also told him we did not have money and to leave or we would call the police, that is when he left. This is what led me to take the decision to flee the country and go to the United States, as I was being actively harassed and threatened because of my ex-partner's involvement with a drug mafia. I feared for my life and my child's.

14. I respectfully submit the instant affidavit, and request that your honor consider this information.

15. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: White Plains, New York

October 18, 2024

Marcia Elizabeth Astudillo Torres

Sworn before me on

8th, day of October, 2024

Notary Public

ASHLEY NUNEZ
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01NU0026203
Qualified in Westchester County
Commission Expires June 26, 2028

EOIR — 18 of 172

# DECLARACIÓN JURADA

ESTADO DE NUEVA YORK }
ss:
CONDADO DE WESTCHESTER }

Marcia Elizabeth Astudillo Torres, debidamente juramentada, por la presente declara y dice:

1. Mi nombre es Marcia Elizabeth Astudillo Torres.
2. Nací en Sigsig, Ecuador el 28 de julio de 1989.
3. Resido en 76 Putnam Avenue, Port Chester, Nueva York 10573 desde junio de 2024 con mi hijo Paulo Andrés Torres Astudillo, nacido el 9 de mayo de 2011 en Cuenca, Ecuador.
4. Huí a los Estados Unidos buscando seguridad para mí y mi hijo.
5. En 2010, después de quedar embarazada de mi hijo, me fui a vivir con su padre, Raúl Elidio Torres Altamirano, con quien estaba saliendo en ese momento. Poco después, descubrí que él no quería renunciar a sus costumbres de salir de fiesta y beber.
6. Mi pareja siempre bebía y salía los fines de semana, luego regresaba a casa y me maltrataba verbal y físicamente. En una ocasión, cuando mi hijo tenía siete (7) meses, me golpeó, me rompió la nariz y me envió al hospital. Nunca lo denuncié a la policía porque era el padre de mi hijo. Este comportamiento era constante con él, yo tenía miedo cada fin de semana, ya que sabía que salía a beber y regresaba con ganas de hacerme daño. A veces incluso se presentaba en mi trabajo para controlarme y asegurarse de que no tuviera amigos. Era muy posesivo. Incluso lastimaba a su propia madre cuando ella intentaba defenderme.
7. Mi pareja no trabajaba ni me mantenía. Yo era la que llevaba el sustento de la casa. Cuando mi hijo tenía unos cinco (5) años de edad encontré unas bolsitas con un polvo blanco en su

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: KTE

pantalón. En ese momento no sabía qué era y lo tiré a la basura y él me golpeó por eso. Después, el hermano de mi pareja me dijo que Raúl consumía drogas.

8. Cuando mi hijo tenía ocho (8) años, mi pareja y yo nos separamos. También busqué ayuda psicológica y fue cuando me di cuenta de lo peligrosa que era mi situación, así como el daño y el trauma que se le estaba infligiendo a mi hijo. Incluso su maestra se comunicó conmigo y me informó que mi hijo le contó cómo su padre me golpeaba. Un día en 2018, mi pareja se fue a buscar trabajo y desapareció por unos tres (3) días. Luego recibí una llamada de él, estaba borracho, y le dije que esto no podía seguir así, dijo que no dejaría el alcohol así que le dije que eso era todo, que ya no podría verme ni a mí ni a mi hijo, luego respondió agresivamente y me dijo que hiciera lo que quisiera.

9. Aproximadamente dos años después, en 2020, la madre de Raúl me llamó para decirme que Raúl estaba al borde de la muerte, ya que Raúl había estado en una pelea con las personas que le proporcionaban las drogas, les debía dinero, por lo que lo apuñalaron. La madre de Raúl me llamó para rogarme que llevara a mi hijo a ver a su padre como último adiós. No llevé a mi hijo a ver a su padre, ya que hablé de esto con mi psicóloga y me dijo que eso podría traumatizar aún más a mi hijo.

10. En febrero de 2024, comencé a recibir llamadas a mi trabajo, la primera fue al teléfono fijo, preguntaron por mí y preguntaron si trabajaba ahí y hasta qué hora. Como yo era recepcionista, fui yo quien tomó la llamada y les pregunté qué necesitaban y cómo podía ayudarlos, pero insistieron en hablar con "Marcia" y me hicieron preguntas sobre mí y mi hijo, así que les dije que estaban hablando con ella y colgaron. Después de esto también adquirieron el WhatsApp de la oficina y se comunicaron nuevamente con la empresa tratando de obtener información sobre mí y mi hijo. Sabían el nombre de mi hijo y me

EOIR — 20 of 172

aterrorizó. Intenté devolver la llamada, pero decía anónimo, no podía ver un número. Me llamaron una segunda vez al número de teléfono celular de la oficina. Me negué a brindar información, así que me dijeron que me llamaban de Turi, donde se encuentra una prisión en Ecuador, y me dijeron que me matarían cuando quisieran, ya que tenían contactos en todas partes y conocían a todos en mi oficina.

11. En ese momento me asusté por la amenaza, así que colgué. Más tarde esa noche, mi hermano me informó que Raúl estaba siendo perseguido por personas peligrosas de una mafia de drogas en Azuay, creo que eran sus traficantes de drogas, porque debía grandes cantidades de dinero. Lo relacioné con las llamadas que había recibido y me preocupé mucho.

12. En marzo de 2024, mi hijo me dijo que sentía que lo seguían, le pregunté por qué pensaba eso y me dijo que afuera de la escuela había un hombre que solo lo miraba a él y que al día siguiente el mismo hombre había estado allí. Después de que me lo dijo, le dije a mi padre que por favor lo recogiera, ya que no quería que mi hijo estuviera solo en la calle. Cuando mi padre regresó de buscar a mi hijo, confirmó que había estado un hombre allí. Mi padre fue a recogerlo varios días después de eso y después de unas cuantas veces dejaron de aparecer. A finales de marzo, mi padre ya no podía recogerlo de la escuela después de su entrenamiento de taekwondo, pero mi hijo quería seguir yendo, así que hablé con un oficial de policía y me dijeron que tenía que solicitarlo ante la junta cantonal con pruebas, pero no tenía ninguna. Debido a esto, decidí no permitir que mi hijo fuera más a su entrenamiento.

13. Durante la primera semana de abril de 2024, traté de comunicarme con alguien de la familia de Raúl para informarles de lo que estaba sucediendo, pero ya no estaban en Cuenca, me enteré por una tía de Raúl, lo que me hizo desconfiar aún más. A mediados de abril, un

hombre entró a mi lugar de trabajo, parecía un drogadicto sin hogar, y me dijo "sabes que necesitas darme dinero y sabes por qué". Este hombre se identificó como miembro de una mafia de drogas del Azuay, la misma mafia de la que había recibido las amenazas anteriores. Un compañero de trabajo salió y le dijo que no teníamos dinero, así que me señaló y dijo "tú no, ella", mi jefe escuchó lo que estaba pasando y salió y también le dijo que no teníamos dinero y que nos fuéramos o llamaríamos a la policía, fue entonces cuando se fue. Esto fue lo que me llevó a tomar la decisión de huir del país e irme a los Estados Unidos, ya que estaba siendo activamente acosado y amenazado debido a la participación de mi expareja con una mafia de drogas. Temía por mi vida y la de mi hijo.

14. Respetuosamente presento la presente declaración jurada y solicito que Su Señoría considere esta información.
15. Declaro bajo pena de perjurio que lo anterior es verdadero y correcto según mi leal saber y entender.

Fecha: White Plains, New York

18 de Octubre, 2024

Marcia Elizabeth Astudillo Torres

Jurado ante mi este

8vo ,día de Octubre de 2024

Notario Público

ASHLEY NUNEZ
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01NU0026203
Qualified in Westchester County
Commission Expires June 26, 2028

EOIR — 22 of 172

# EXHIBIT D

# Ecuador 2023 Human Rights Report

## Executive Summary

There were no significant changes in the human rights situation in Ecuador during the year.

Significant human rights issues included credible reports of: cruel, inhuman, or degrading treatment or punishment by the government; harsh and life-threatening prison conditions; serious problems with the independence of the judiciary; serious restrictions on freedom of expression and media, including violence against journalists and the existence of criminal libel laws; serious government corruption; and extensive gender-based violence, including domestic or intimate partner violence, sexual violence, workplace violence, and femicide.

The government took credible steps to identify and punish officials who may have committed human rights abuses.

Violence, including killings, by criminal groups increased. Members of criminal gangs in prisons committed acts of torture and killed their rivals during prison disturbances. There were incidents of violence and threats of violence against politicians, journalists, prosecutors, and judges likely perpetrated by nongovernment actors. Members of society engaged in crimes involving violence or threats of violence targeting lesbian, gay,

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (23 of 69)



bisexual, transgender, queer, or intersex persons. The government investigated and prosecuted such actions.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were no reports that the government or its agents committed arbitrary or unlawful killings, including extrajudicial killings, during the year.

Regarding the deaths of protesters during the June 2022 demonstrations, a local human rights organization reported the attorney general's investigation had yielded few results and progressed slowly. Although the Attorney General's Office summoned more than 80 police officers to testify, fewer than 20 came forward. Civil society and social organizations claimed authorities failed to call individuals to testify who were with one of the persons killed, Byron Guatatuca Vargas, when he died.

As of October 31, police reported more than 6,550 homicides, an increase of almost 70 percent compared with 2022. Police attributed a large part of the country's rising homicide rate to increased drug trafficking and conflicts among gangs fighting over drug trafficking routes. On March 3, President Guillermo Lasso declared a state of emergency in the coastal province of Esmeraldas. Media reported a mass killing on April 11 at the fishing port in

Esmeraldas, when 30 hooded men arrived aboard boats and began shooting at residents and fishermen, killing nine and wounding four. The minister of interior attributed the killings to a dispute between local drug gangs for control of the port.

Drug gang violence dramatically increased in the coastal provinces of Guayas, Santa Elena, and Los Rios. In March and April, authorities registered a surge in kidnappings, robberies, and killings, including a beheading. On April 1, President Lasso announced urgent security measures to confront crime, including declaring a state of emergency and curfew in the three provinces.

Media reported 14 attempts to kill candidates and elected officials, resulting in the deaths of four political candidates, five elected officials, and one political party leader as of October. On August 9, gunmen shot and killed presidential candidate Fernando Villavicencio at a Quito campaign event. The attack occurred 11 days before the first round of snap presidential and legislative elections. Police shot the suspected killer seconds after the event, and he died from his injuries shortly afterwards. Police arrested 13 additional suspects in the killing, and on August 10, a judge ordered pretrial detention for all 13 suspects. Six suspects were found killed in the Litoral prison in Guayaquil on October 6. Another suspect was found dead in the El Inca prison in Quito on October 7. A pretrial hearing date for the remaining six suspects was scheduled for December 19.

On February 26, the Confederation of Indigenous Nationalities of Ecuador reported two unidentified gunmen killed the confederation's director for international relations and environmental activist, Eduardo Mendua, outside his home in the Amazonian province of Sucumbios. Mendua's death occurred amid confrontations between Indigenous communities and the state-owned oil company Petro Ecuador. According to the Attorney General's Office, three suspects were in custody.

In December 2022, the Guayas Provincial Court sentenced a member of Los Águilas gang to 30 months in prison for his involvement in the August 2022 attack in the Cristo del Consuelo neighborhood in Guayaquil that killed five persons, injured 17 others, and destroyed seven houses.

## b. Disappearance

There were no reports of disappearances by or on behalf of government authorities.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

While the law prohibited torture and similar forms of intimidation and punishment, there were credible reports police officers and prison guards abused suspects and prisoners.

On August 1, the Attorney General's Office initiated criminal proceedings

against five active-duty police officers for the alleged rape of a citizen detained in a Community Watch Unit in Guayaquil on July 30. According to the complaint, two of the accused officers allegedly raped the individual with an object, while the others allegedly sprayed him with pepper spray and hit him in his back and face.

Authorities also were investigating two alleged cases of rape by four active-duty military officers in Cuenca. The sexual assaults allegedly occurred on different dates and against two different women: a second lieutenant and an enlisted soldier. According to the allegations, the first case allegedly occurred in December 2022 inside a military compound, while the second case allegedly occurred in March in a hostel.

## Prison and Detention Center Conditions

Prison conditions were harsh and life threatening due to gross overcrowding, food shortages, inadequate sanitary conditions, lack of medical care, and gang violence.

**Abusive Physical Conditions:** Prisons continued to be overcrowded. According to the government's National Service of Comprehensive Attention to Adults Deprived of Liberty and Adolescent Offenders, the overcrowding rate was 13 percent above designed capacity as of July 21, compared with 8 percent in 2022. The overcrowding rate varied by prison, with some prisons such as the Guayaquil Regional Prison (and the Litoral prison in particular)

significantly overcrowded and others such as the Riobamba Prison operating under capacity.

Access to and quality of food, potable and hot water, heating, sanitation, and medical care were inadequate.

Multiple institutions, government officials, and nongovernmental organizations (NGOs) reported criminal gangs controlled most prisons. An NGO reported health workers were reluctant to enter the prisons because they feared being attacked. The NGO said gangs monopolized the food supply and distributed meals at their discretion.

Prison officials and human rights organizations agreed most violent deaths in prisons were the result of rivalries among criminal gangs with links to drug cartels. Fighting between drug trafficking gangs in prisons led to 54 violent deaths through August 21. On July 22, a three-day clash between gangs in a Guayas prison left 31 dead, according to the Attorney General's Office.

On September 6, several human rights organizations reported that male inmates entered the women's pavilion in a prison in Quevedo to rape, attack, and torture female inmates in complicity with the prison's authorities. Authorities' responses were pending as of the end of November.

**Administration:** Authorities sometimes conducted investigations of credible allegations of mistreatment in prisons.

**Independent Monitoring:** Civil society representatives continued to report restrictions to monitoring by independent NGO observers.

## d. Arbitrary Arrest or Detention

The law prohibited arbitrary arrest and detention and provided for the right of any person to challenge the lawfulness of their arrest or detention in court, but there were reports provincial and local authorities did not always observe these provisions. According to NGOs, illegal detentions continued to occur.

### Arrest Procedures and Treatment of Detainees

The law required authorities to issue specific written arrest orders prior to detention, and a judge was required to charge a suspect with a specific criminal offense within 24 hours of arrest. NGOs stated judges frequently did not determine a specific criminal offense, particularly for arrests of protesters. Authorities generally observed the time limit for charging a suspect, although in some provinces initial detention was often considerably longer.

Detainees had a constitutional right to an attorney. Those without financial means to pay for an attorney had the right to request a court-appointed attorney from the Public Defender's Office. Although court-appointed defenders were available, the number of cases and limited time to prepare

EOIR — 30 of 172

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (29 of 69)



for the defense continued to present a disadvantage to defendants using a public defender during trials.

The law entitled detainees to prompt visits by lawyers and family members, but NGOs continued to report delays depending on the circumstances and the willingness of local courts and prison guards to enforce the law.

**Pretrial Detention:** Corruption and general judicial inefficiency caused trial delays. The length of pretrial detention did not usually exceed the maximum sentence for the alleged crime. A human rights organization reported the misuse of pretrial detention was common throughout the country and led to overcrowding, violence, and insufficient health services in prisons.

## e. Denial of Fair Public Trial

While the constitution provided for an independent judiciary, corruption impaired the judicial process. Legal experts, bar associations, and NGOs reported on the susceptibility of the judiciary to take bribes for favorable decisions and faster resolution of cases. Violence and outside pressure, especially from criminal groups, further compromised judicial independence and impartiality.

Civil society organizations expressed concern regarding judicial independence and pointed to events that, in their judgment, reflected attempts to influence the judiciary or constituted power struggles among

EOIR — 31 of 172

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB
RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (30 of 69)



judicial officials that compromised the administration of justice. In February, the National Court of Justice appointed Wilman Teran as head of the Judicial Council. Teran then made a series of decisions that civil society groups characterized as "dubious." At midnight on February 17, the Judicial Council removed all its provincial directors and designated Teran's alleged close contacts as directors to form a new majority on the council. Civil society groups claimed this new majority approved questionable resolutions to hire, fire, and reassign judges nationwide. For example, on August 19, in a late-night virtual vote, the council, despite not having a majority present, moved to fire one of its members, Judge Walter Macias. President Lasso, Attorney General Diana Salazar, and the entire National Court of Justice called for the resignation of Teran and other council members. On September 14, a Pichincha judge annulled the council's decision to remove Macias and ordered his immediate reinstatement as a National Court of Justice judge. Once reinstated, on September 28, Macias called to trial two council members for influence peddling. Both members were subsequently removed from the council.

Media reported criminal groups killed Guayas Province prosecutor Leonardo Palacios on June 1 in Duran. According to the Attorney General's Office, Palacios had been investigating a homicide. Separately, on June 1, six armed, hooded individuals threatened to kill Attorney General Salazar through a video sent to her personal cell phone.

EOIR — 32 of 172

On July 14, police reported an armed attack on the local offices of the Attorney General's Office in Santo Domingo. One official was injured in the attack. On July 27, the Attorney General's Office announced prosecutors and judicial officials in the coastal provinces of Guayas, Manabi, Esmeraldas, Santo Domingo, and Los Rios would telework for security reasons.

In March, a judge sentenced three individuals to 34 years in prison as coauthors of the May 2022 murder of prosecutor Luz Marina Delgado and her assistant. As of September, the Attorney General's Office continued to investigate the August 2022 killings of prosecutor Federico Estrella and judge Nelson Patricio Yánez.

According to the Judiciary Council, there was a $265 million deficit for the administration of justice, including shortfalls in funds necessary to pay salaries of judiciary officials, update infrastructure and technology, and buy office supplies. The council also noted a deficit of 692 judges and 500 prosecutors nationwide, which, according to an NGO, led to high workloads for public servants and delays and potential violations of due process.

## Trial Procedures

The law provided for the right to a fair and public trial, and the judiciary generally enforced this right. While defendants had the right to free assistance from an interpreter, some defendants complained the lack of an interpreter at court hearings made preparation of a defense problematic for

EOIR — 33 of 172

non-Spanish speakers, and that the quality of interpreters was poor and caused problems when working with public defenders.

Judges reportedly rendered decisions more quickly or more slowly due to media and political pressure or fear in some cases. There were reported delays of up to one year in scheduling some trials. Prisoners reported lengthy delays in setting dates for preliminary hearings after their cases reached a higher court.

### Political Prisoners and Detainees

There were no reports of political prisoners or detainees.

## f. Transnational Repression

Not applicable.

## g. Property Seizure and Restitution

Not applicable.

## h. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The law prohibited such actions, and there were no reports the government failed to respect these prohibitions.

EOIR — 34 of 172

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (33 of 69)



# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The constitution provided for freedom of expression, including for members of the press and other media, but laws restricted this right. Civil society organizations reported criminal groups perpetrated widespread violence and harassment against journalists, causing them to self-censor their reporting.

**Freedom of Expression:** There were significant restrictions on media freedom. Journalists and NGOs said certain politicians and political parties continued to use the "press as enemy" trope and accuse media of being "corrupt" and "liars." The media watchdog NGO Fundamedios said the government had not made substantial progress on freedom of expression rights, noting both the lack of progress on investigating and prosecuting high-profile past abuses and continuing abuses.

Several journalists and news outlets objected to President Lasso's speech criticizing the press following a government corruption investigation – spurred by investigative reporting – that allegedly connected him to criminal groups. During a February 14 national broadcast, the president referred to journalists as "mercenaries of news entertainment" and "media terrorists,"

EOIR — 35 of 172

suggesting the journalists were seeking "likes" [on social media] to "continue collecting their pay."

The law prohibited persons from using "discrediting expressions," treated as a misdemeanor with a 15- to 30-day detention. There were no reports the government invoked this law to restrict freedom of expression.

**Violence and Harassment:** Local government authorities and criminal groups committed acts of violence and harassment against journalists. Fundamedios reported 39 acts of violence or harassment against journalists perpetrated by state actors between January and July. Civil society organizations maintained the state did not adequately investigate or prosecute the crimes and demonstrated little effort to halt the aggressions.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:** Fundamedios reported four censorship cases between January and July, three of which were initiated by the state and one by a news outlet. The NGO noted the government did not adequately investigate or prosecute these cases.

According to Fundamedios, the government canceled the bidding process for the allocation of FM radio and broadcast television frequencies, announced in 2020. Civil society organizations had criticized the Agency for the Regulation and Control of Telecommunications-administered bidding process as lacking transparency and allowing two bidders to accumulate a

EOIR — 36 of 172

disproportionate number of frequencies.

**Libel/Slander Laws:** Libel and slander were criminal offenses under the law, with penalties of up to three years in prison, plus fines. The law assigned responsibility to media owners as well as journalists, who were held liable for opinion pieces or statements by reporters or others, including readers, using their media platforms. Monitoring organizations reported the national government did not prosecute journalists for libel during the year, but they reported three cases in which politicians initiated legal proceedings against journalists.

Civil society organizations reported a judge sentenced *Guayaquil News* journalist and director Guillermo Lizarzaburu and businessman Juan Pablo Paz to two years in prison following a complaint filed by former legislator Pablo Muentes. Muentes accused Lizarzaburu and Paz of using anonymous social media accounts to slander Muentes.

*El Universo* newspaper cartoonist Xavier Bonilla (whose nom de plume was "Bonil") faced a libel suit after he published a cartoon allegedly accusing Alembert Vera, president of the Citizen Participation and Social Control Council and previously a lawyer for former President Rafael Correa, of embezzlement and involvement in organized crime. According to Fundamedios, Vera's father, Gutemberg Vera, filed the libel case against Bonil.

**Nongovernmental Impact:** Unknown persons not presumed connected with government authorities conducted attacks against journalists during the year. Civil society organizations reported criminal groups perpetrated widespread violence and harassment against journalists. According to Fundamedios, as of July 31, five journalists fled the country following serious death threats from criminal groups. Karol Noroña, a journalist from digital news outlet *GK* who reported on organized crime and prison violence, fled the country on March 24 after receiving death threats. Journalists and civil society organizations reported journalists covering corruption, prison violence, and violence linked to the drug trade often self-censored their reporting due to fear of reprisals from criminal groups.

On March 20, television stations and journalists simultaneously received envelopes containing explosive devices. Unknown individuals sent three envelopes to the newsrooms of the television stations Ecuavisa, Teleamazonas, and TC Television, while the other two were sent to radio station EXA FM and journalist Carlos Vera. Most journalists were unharmed except for Ecuavisa journalist Lenin Artieda, who suffered minor injuries when he inserted into his computer a memory stick that contained an explosive device. The Attorney General's Office opened an investigation into the attacks.

On April 24, the Attorney General's Office reported that a judge sentenced two individuals each to 34 years and six months in prison for the murder of

EOIR — 38 of 172

journalist Gerardo Delgado in August 2022. In February 2022, a Guayas court convicted and sentenced to prison six other individuals for the crime. As of August 25, five of the individuals were appealing the court's decision.

**Actions to Expand Freedom of Expression, Including for Members of the Press and Other Media:** On August 23, the government issued a decree that defined risk prevention and protection measures for journalists. The decree included new risk prevention measures, such as mapping risks facing journalists, the development of protection protocols, and the creation of support networks. New protection measures included monitoring threats and attacks and security training for journalists.

## Internet Freedom

The government did not restrict or disrupt access to the internet or censor online content.

A government regulation required that internet service providers comply with all information requests from the superintendent of telecommunications, allowing access to client Internet Protocol addresses and information without a judicial order. The law held media outlets responsible for online comments from readers if the outlet had no established mechanisms for commenters to register their personal data (including national identification number) or no system to delete offensive comments. The law also prohibited media from using information obtained

from social media unless they verified the author of the information.

As of August 25, the government had not issued regulations for the application of a 2021 law regarding personal data protection and had not appointed a data protection superintendent. Media watchdog groups such as Fundamedios previously had largely praised the law for establishing high standards for data and privacy protection while protecting freedom of expression.

## b. Freedoms of Peaceful Assembly and Association

The law provided for the freedoms of peaceful assembly and association, and the government generally respected these rights, although authorities declared four states of exception throughout the year due to rising crime and natural disasters. The related executive decrees included restrictions on freedom of assembly, association, and the inviolability of home and correspondence. Three decrees enabled the government to deploy the armed forces to support police operations.

### Freedom of Peaceful Assembly

The law provided for freedom of peaceful assembly, and the government generally respected this right. Public rallies required prior government permits, which authorities usually granted.

Human rights organization reported that after a Global Marijuana March in



EOIR — 40 of 172

Guayaquil on May 5, police officers harassed demonstrators and removed them from the street, citing lack of permits. According to a human rights activist, police officers attempted to confiscate a speaker and other equipment from a demonstrator and assaulted other participants with batons and pepper spray.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The law provided for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees and other humanitarian organizations in providing protection and assistance to refugees, returning refugees, or asylum seekers, as well as other persons of concern.

**Access to Asylum:** The law provided for the granting of asylum or refugee

status, and the government had established a system for providing protection to refugees.

**Abuse of Refugees and Asylum Seekers:** Migrants and refugees, especially women, children, and lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) individuals, sometimes experienced gender-based violence and human trafficking, according to UN agencies and local NGOs. Authorities reported an increase in forced labor, sex trafficking, and the forced recruitment of migrants and refugees into criminal activity, such as drug trafficking and robbery, on the northern and southern borders, particularly by domestic criminal groups and transnational criminal organizations that also operated in Colombia. Forced recruitment increasingly took place in schools and targeted young persons, especially young men and adolescents. Continued migrant and refugee arrivals at irregular crossings, due to visa requirements for Venezuelan nationals; increasing xenophobia; and a lack of local and municipal government coordination or capacity to address the protection of particularly vulnerable groups complicated the government's ability to address and prevent abuses against migrants and refugees. Migrants reported a lack of trust, significant corruption, and xenophobia in public institutions, including within police and the Attorney General's Office, that made it difficult to report abuse, especially gender-based violence and human trafficking.

Migrants faced abuses such as overtime work without due pay, especially in

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (41 of 69)



the growing digital platform sector. According to a union, 80 percent of digital platform workers were migrants.

**Freedom of Movement:** With the end of the special protocol in August for registering and regularizing unaccompanied minor migrants, they risked being institutionalized.

**Access to Basic Services:** The law provided for protection and access to health care, education, and other services to all individuals irrespective of their migration status. Nonetheless, some Venezuelan migrant and refugee children remained out of the school system, according to official government statistics. According to NGOs, barriers to the enrollment and retention of refugee and migrant children in school included a lack of information regarding the right to access to education, hidden costs of schooling such as uniforms, lack of classroom space, and in some instances xenophobic attitudes towards Venezuelans, including discrimination and arbitrary documentation requirements for school enrollment.

According to UN agencies and NGOs, refugees encountered discrimination in accessing employment and housing. Recognized refugees received national identification cards intended to facilitate access to education, employment, banking, and other public services; however, refugees and migrants reported that at times employers did not recognize government-issued documents that established their right to work, and international organizations reported that registration documents were often not



EOIR — 43 of 172

sufficient to access bank accounts in practice. Further, international organizations and NGO partners reported the public health system had "totally collapsed." A strained public health system complicated access to health care for migrants and refugees with serious and chronic illnesses, as well as gender-based violence survivors, LGBTQI+ migrants, and sex workers seeking access to sexual and reproductive health services.

**Durable Solutions:** The government accepted refugees for resettlement and offered naturalization to refugees but recognized very small numbers of Venezuelan refugees. Colombian nationals constituted 96 percent of all recognized refugees. Discrimination and limited access to formal employment and housing affected refugees' ability to integrate into the local community.

**Temporary Protection:** Registration for an estimated 350,000 Venezuelans who entered the country irregularly opened on February 16. Previously, in September 2022, the Ministry of Interior opened the registration process to an estimated 120,000 Venezuelan migrants who had entered the country regularly, as well as all unaccompanied minors, regardless of nationality or migration status. Registration for an estimated 90,000 non-Venezuelans who entered the country regularly opened in November 2022. Registration produced a certificate that acted as a temporary residence permit and protected the holder from deportation on migration-related grounds or from incurring migration-related fines while the regularization process was

underway. On August 31, registration closed for all groups, after more than 200,000 migrants had completed registration. Through April 2024, registered individuals could request a temporary residency visa from the Ministry of Foreign Affairs. As part of the larger regularization initiative, the Ministry of Social and Economic Inclusion implemented a special procedure to register and regularize 776 unaccompanied minors.

# Section 3. Freedom to Participate in the Political Process

The law provided citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

## Elections and Political Participation

**Abuses or Irregularities in Recent Elections:** National elections were widely reported to be fair and free of abuses and irregularities.

**Participation of Women and Members of Marginalized or Vulnerable Groups:** Social media harassment of women politicians and candidates continued. The NGO Participación Ciudadana (Citizen Participation) found 331 derogatory tweets against 38 women in politics and government in a study conducted between January 3 and February 2, which coincided with the official electoral campaign period leading up to the February 5 local and

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (44 of 69)



provincial elections. According to the study, derogatory tweets contained discriminatory messaging dealing with the perceived roles of women in society.

## Section 4. Corruption in Government

The law provided criminal penalties for corruption by officials, and the government generally implemented the law effectively. There were numerous reports of government corruption throughout the year.

**Corruption:** The government launched or continued multiple investigations, judicial proceedings, and legislative audits of officials accused of corruption related to state contracts and commercial endeavors that reached the highest levels of government. In December 2022, President Lasso inaugurated the country's first specialized court for corruption and organized crime. The court began hearing cases early in the year and won its first convictions in July and August.

On May 25, judge Banny Molina, who granted a habeas corpus that many considered legally dubious to former Vice President Jorge Glas (convicted on corruption charges in August 2022), was charged with unlawful usurpation of power and sentenced to one year in prison. In November 2022, a judge from Santo Domingo Province approved an early release for time served for Glas. Emerson Curipallo, a judge from Guayas Province, restored Glas's political rights on June 8, despite the law stipulating that Glas's political

Uploaded on: 10/18/2024 at 11:24:13 AM (Eastern Daylight Time) Base City: NYB RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (45 of 69)



rights could be restored only upon completion of his prison sentence. The Electoral Dispute Tribunal fined Curipallo $31,500, removed his political rights, and dismissed him from office on August 24 for interfering in the electoral process.

On February 22, the Attorney General's Office announced it had filed bribery-related charges against former President Lenin Moreno and 37 others related to the construction of the controversial Chinese government-backed Coca Codo Sinclair dam and hydroelectric plant. Investigations began in 2019, after journalists exposed an offshore Panamanian company with links to Moreno and dam builder Sinohydro's Ecuadorian lobbyist. The preliminary hearing took place on March 3, and the Attorney General's Office included three new suspects in the case. The Solicitor General's Office charged 18 of the 37 persons originally accused by the Attorney General's Office in June. The case continued as of November 15.

For additional information about corruption in the country, please see the Department of State's *Investment Climate Statement* for Ecuador and the Department of State's *International Narcotics Control Strategy Report*, which includes information on financial crimes.

## Section 5. Governmental Posture Towards International and Nongovernmental Monitoring and

EOIR — 47 of 172

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (46 of 69)



## Investigation of Alleged Abuses of Human Rights

A number of domestic and international human rights groups generally operated without government restriction to monitor or investigate human rights conditions or cases and publish their findings. Government officials were often cooperative and responsive to the views of these groups.

A human rights organization reported cases in which the government denied or was reluctant to provide updated information to local human rights NGOs who were conducting investigations.

**Retribution Against Human Rights Defenders:** A human rights organization reported continuous harassment and threats to community-based human rights defenders and their families. As a result, some human rights activists were forcibly displaced from their communities.

**Government Human Rights Bodies:** The Ombudsman's Office was an administratively and financially independent body focused on human rights and subordinate to the Transparency and Social Control branch of government. Some human rights groups viewed the Ombudsman's Office as lacking sufficient initiative and experience to deal effectively with critical human rights cases.

EOIR — 48 of 172

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (47 of 69)



# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:** The law criminalized rape of men and women, including spousal and intimate partner rape and other forms of domestic and sexual violence. Rape was punishable with penalties of up to 22 years in prison. The law did not specify so-called corrective rape of LGBTQI+ individuals. The penalty for rape where death occurred was 22 to 26 years' imprisonment. Domestic violence was punishable with penalties ranging from four days to seven years in prison and a substantial fine for "damages, pain, and suffering," depending on the severity of the crime. The government did not enforce the law effectively.

According to local experts, reporting rapes and other forms of violence continued to be a traumatic and revictimizing process, particularly for girls. For example, a rape survivor had to file a complaint at the Attorney General's Office and submit to gynecological evaluations (akin to forensic exams designed) administered by medical experts. Many individuals did not report cases of rape and sexual assault due to fear of retribution from the perpetrator and social stigma. Women living in rural areas of the country encountered further difficulties reporting assaults, due to the limited presence of government offices in their towns.

The law provided for reparations to survivors of gender-based violence. The

EOIR — 49 of 172

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (48 of 69)



law defined rape, including spousal rape or incest, forced prostitution, sexual harassment, and other analogous practices, as forms of sexual violence. It also entitled survivors to immediate protective measures designed to prevent or stop additional violence, such as police surveillance, placement in shelters, and assistance programs for the survivor and family. These measures were generally enforced.

According to human rights organizations, survivors were generally reluctant to press domestic violence charges. Judges lacked specialized training for dealing with gender-based violence, and the court system was insufficiently staffed to deal with the caseload.

**Other Forms of Gender-based Violence or Harassment:** The law provided for penalties of one to five years in prison for sexual harassment. The law mandated that judges prohibit contact between the aggressor and the survivor to prevent revictimization and intimidation, and the law was generally enforced. Despite the legal prohibition of sexual harassment and government implementation of the law, women's rights organizations said survivors tended not to report alleged harassment and that harassment remained common in public spaces, including on social media.

In November 2022, the government elevated the Secretariat of Human Rights to a ministry, renamed the Ministry of Women and Human Rights. Civil society and international organizations reported slow progress in government efforts to prevent femicides and implement the Unified

EOIR — 50 of 172

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (49 of 69)



Registry of Violence Against Women, as stipulated by law.

As of August 23, the Attorney General's Office reported 64 femicides, on track to exceed the 88 total femicides in 2022. The Attorney General's Office also reported the judiciary had sentenced individuals involved in 13 of the 88 femicide cases in 2022.

Police Lieutenant Colonel German Caceres, sought for allegedly killing his spouse in September 2022, was captured by Colombian police in December 2022. Caceres confessed to the crime of femicide, and on May 25, a judge sentenced him to 34 years and eight months in prison. The judge also ordered Caceres to pay $260,000 in compensation to the victim's family.

**Discrimination:** The constitution afforded women the same legal status and rights as men. Nevertheless, discrimination against women was prevalent, particularly with respect to economic opportunities for older women and for those in the lower economic strata. Women continued to face wage disparities compared with men. NGOs said women also faced discrimination in job recruitment, housing access, and some judicial proceedings, namely, in reporting and filing charges in cases of alleged sexual abuse.

According to union leaders, employers continued to assign women heavier workloads, forcing them to "clean up" workstations afterhours, especially in the agricultural sector. A workers' association alleged this also occurred in a textile factory where women regularly worked overtime and did not receive

EOIR — 51 of 172

minimum wage. Official statistics showed that in July, the average monthly income for an employed man was 22 percent higher than for an employed woman.

On January 10, the National Assembly approved a "violet economy law" to promote gender equality in the labor market. The law mandated that men and women in the public and private sectors receive equal pay; that companies with three or more members on their boards of directors ensure that at least one of them be a woman; that protocols exist to prevent sexual harassment and deal promptly and fairly with complaints; and that companies refrain from asking discriminatory questions during selection processes or request different or additional documents to verify women's competencies. The law also strengthened the labor inspection system to adequately address gender issues. Private companies were to receive tax incentives when creating jobs for women.

On May 12, the legislature passed the "human care law," which created and extended workers' paid and unpaid leave for the birth of a child. The law extended nursing leave by three months, added five days of paternal leave after the baby was born, and granted paid leave to attend medical checkups for both parents during pregnancy, labor, and birth. The law provided for permanent lactation rooms in offices with 50 or more women of childbearing age and 20-minute breaks every two hours to use the rooms. At the worker's request, employers were required to provide child care

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (51 of 69)



onsite or pay for offsite child care for children under five years of age.

**Reproductive Rights:** There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

Some women's rights activists complained that a lack of comprehensive sex education limited individuals' ability to manage their reproductive health and that ineffective distribution of birth control reduced access to contraception. Emergency contraception was available as part of methods for family planning; however, conservative groups' stance against contraceptive use and social stigma, including potential social ostracization, discouraged women from seeking family planning services.

The government provided access to sexual and reproductive health services for survivors of sexual violence. Emergency contraception and postexposure prophylaxis was available as part of clinical management of rape.

A 2019 study found income status affected equity in sexual and reproductive health access and outcomes, with low income and rural individuals having significantly less access. UN agencies reported that vulnerable populations, including Afro-Ecuadorians, Indigenous groups, rural inhabitants, LGBTQI+ individuals, persons with disabilities, HIV-positive persons, and migrants, faced limited access and discrimination regarding the provision of reproductive health services. Adolescents also encountered barriers to access reproductive health services.

EOIR — 53 of 172

International organizations said public hospitals continued to face problems when stocking and restocking emergency contraception materials nationwide. Organizations reported that despite government efforts to make contraception materials available, the lack of supply and demand studies to accurately calculate quantities, delays in delivering material from central warehouses to local hospitals, the lack of updated population statistics, and unpredictable migration flows complicated these efforts.

While the law prohibited discrimination against girls who become mothers, NGOs reported some faced discrimination and subsequently left school. A lack of resources also resulted in young mothers discontinuing their education to pursue work.

Following a 2020 Inter-American Court of Human Rights ruling that held the state accountable for failing to protect the rights of a girl who was harassed and sexually abused by her school's vice rector, which led to her suicide, the Ministry of Education launched the National Strategy for Comprehensive Sex Education on August 14. Although several international and civil society organizations applauded the initiative, they reported that implementation remained the initiative's biggest problem.

## Systemic Racial or Ethnic Violence and Discrimination

The constitution declared the state to be plurinational and affirmed the principle of nonviolence and nondiscrimination by recognizing the rights of

Indigenous, Afro-Ecuadorian, and Montubio (an independent ethnic group of persons with a mixture of Afro-Ecuadorian, Indigenous, and Spanish ancestry) communities. It also mandated affirmative action policies to provide for the representation of minorities. NGOs and civil society representatives said those provisions were not effectively enforced.

Citing 2021 official data, media reported Indigenous, Afro-Ecuadorian, and Montubio populations experienced the highest poverty rates in the country. Among those populations, the most affected were Indigenous children, followed by Montubio girls.

Afro-Ecuadorians, who accounted for approximately 4.8 percent of the population according to the most recent census (2022), suffered pervasive discrimination, particularly regarding educational and economic opportunity. Afro-Ecuadorian organizations noted that despite the absence of official discrimination, societal discrimination and stereotyping in media continued to result in barriers to employment, education, and housing. A national gender survey published in 2019 found Afro-Ecuadorian women were particularly vulnerable to gender-based violence and harassment based on racial, gender, and sexual stereotypes.

An Afro-Ecuadorian rights NGO reported media discriminated against Afro-Ecuadorians. Local human rights NGO Regional Human Rights Advisory Foundation reported that while conducting an operation, military personnel approached a young Afro-Ecuadorian on May 29 in Quito when he was

Uploaded on: 10/18/2024 at 11:24:13 AM (Eastern Daylight Time) Base City: NYB RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (54 of 69)



walking home after school. A news outlet was broadcasting the operation live, and journalists misconstrued the boy's presence and described him as an alleged criminal. A local human rights group provided legal assistance to the family and filed an injunction on June 12, arguing the journalists had violated his right to equality, nondiscrimination, identity, and good name, and demanding the journalists clear his name. On July 7, a judge rejected the injunction.

Afro-Ecuadorians reported employers often profiled them based on their job application photographs and racial stereotypes.

Indigenous and LGBTQI+ individuals as well as persons with disabilities also experienced employment discrimination.

## Indigenous Peoples

There were isolated reports of restrictions on Indigenous persons and their institutions in decisions affecting their property or traditional ways of life.

The law provided Indigenous persons the same civil and political rights as other citizens. The constitution recognized Kichwa and Shuar as "official languages of intercultural relations." The constitution obligated the state to consult local communities and Indigenous persons prior to initiation of projects on their lands through a process that was free, informed, and culturally appropriate (FPIC), although Indigenous peoples' organizations noted public- and private-sector actors often ignored this process. In 2008,

EOIR — 56 of 172

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB
RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (55 of 69)



Indigenous leaders began pressing the government to formally consult its communities affected by extractive activities, but the government had yet to pass a national-level community consultation law.

The constitution allowed Indigenous persons to participate in the economic benefits that natural resource extraction projects brought and to receive compensation for any damages that resulted. In the case of environmental damage, the law mandated immediate corrective government action and full restitution from the responsible company, although some Indigenous organizations asserted a lack of consultation and remedial action. The law recognized the rights of Indigenous communities to hold property communally, although the titling process remained incomplete in parts of the country.

On May 31, the government reformed the law that regulated the environmental consultation process (different from FPIC) required prior to granting environmental licenses for projects that impacted the environment within a community. The process consisted of informing involved communities regarding the details of extraction projects that would impact the environment (but not necessarily obtaining consent from those communities).

Human rights organizations reported violent confrontations on July 14 between antimining activists and police in Las Naves, Bolivar Province, during an information session for a mining project. The clashes resulted in

EOIR — 57 of 172

two arrests and 10 individuals injured. Antimining activists alleged the government deployed a disproportionate police and military force to the area to safeguard the process and repress protesters. The Confederation of Indigenous Nationalities of Ecuador filed a lawsuit questioning the reform's constitutionality. The Constitutional Court accepted the case on August 1, which suspended the application of the new regulation, halting 178 key infrastructure, mining, renewable, and oil and gas projects for an unspecified amount of time.

## Children

**Birth Registration:** According to UNICEF, registration of children with teenage mothers and fathers continued to pose a problem for the government, since the law required underage parents be accompanied by an adult to register their children. While the law prohibited schools from requesting civil registration documents for enrollment, some (mostly public) schools continued to require them. Other government services, including welfare payments and free primary health care, required some form of identification. Migrant children were particularly affected by this requirement, which prevented adequate access to these services.

**Child Abuse:** The law criminalized child abuse and provided penalties of 30 days to 26 years in prison, depending on the severity of the abuse. The government enforced the law effectively.

**Child, Early, and Forced Marriage:** The legal marriage age was 18. There were reports of early and forced marriage in rural and poor areas. The government did not enforce the law effectively.

According to a study by the Planning and Social Studies Center, Plan International, the UN Population Fund, and UNICEF, 27 percent of women ages 18-49 married or entered a domestic partnership before they turned 18. The study showed girls belonging to the poorest quintile were four times more likely to marry by age 18 compared with girls in the richest quintile.

**Sexual Exploitation of Children:** The law prohibited the sale, grooming, or use of children for commercial sexual exploitation, including sex trafficking, sexual exploitation of children, and child pornography, with penalties of 22 to 26 years' imprisonment. The government enforced the law effectively. The penalty for human trafficking, including child sex trafficking, was 13 to 16 years in prison. Authorities did not criminalize all forms of child sex trafficking. The criminal code required proof of force, fraud, or coercion as essential elements of a trafficking crime, neglecting to recognize that anyone younger than age 18 was unable to provide informed consent. The age of consent was 14.

## Antisemitism

There was a small Jewish community, including an estimated 500 individuals

in Quito, 50 individuals in Guayaquil, and an unspecified number of individuals elsewhere in the country. The Jewish community reported the vandalization of an external wall of the Jewish cemetery in Quito with Nazi symbols on January 27. The community painted over the wall and decided not to take legal action against the aggressors.

## Trafficking in Persons

See the Department of State's annual *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

# Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:** No laws criminalized same-sex conduct or gender identity or expression.

**Violence and Harassment:** The NGO Silueta X reported 25 killings of LGBTQI+ individuals as of November 20. The killings were allegedly perpetrated by nonstate actors. LGBTQI+ organizations claimed government institutions in general failed to properly register and categorize violent acts against the LGBTQI+ community, leading to underreporting. LGBTQI+ groups claimed police and prosecutors did not thoroughly investigate deaths of LGBTQI+ individuals, including when there was

suspicion that the killing was motivated by anti-LGBTQI+ bias. The NGO Fundación Ecuatoriana Equidad (Ecuadorian Equality Foundation), a sexual health and LGBTQI+ advocacy group, cited police and prosecutors' lax attitude and the lack of technical capacity and knowledge regarding LGBTQI+ individuals to explain insufficient investigations into crimes committed against LGBTQI+ persons.

The law also prohibited hate crimes, but LGBTQI+ activists asserted that since the legal codification of hate crimes in 2008, there had been no hate crime convictions for crimes against LGBTQI+ persons.

**Discrimination:** The constitution included the principle of nondiscrimination with respect to gender identity or sexual orientation. The law prohibited discrimination based on sexual orientation and gender identity. LGBTQI+ persons continued to suffer discrimination from both public and private entities, particularly in education, employment, and access to health care. LGBTQI+ organizations reported transgender persons suffered more discrimination because they were more visible. The law recognized LGBTQI+ couples but did not allow same-sex adoption. For this reason, the law did not grant LGBTQI+ couples rights equal to rights of other persons.

LGBTQI+ persons continued to report the government sometimes denied them equal access to formal education. Fundación Ecuatoriana Equidad indicated the government did not comprehensively apply policy provisions to prevent and combat discrimination. LGBTQI+ students, particularly

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (60 of 69)



transgender students, sometimes were discouraged from attending classes and were more susceptible to bullying in schools. Human rights activists argued the Ministry of Education and school administrators were slow to respond to complaints regarding harassment, discrimination, or abuse against LGBTQI+ persons.

LGBTQI+ persons involved in the commercial sex trade reported abusive situations, extortion, and mistreatment by security forces. In March, sex workers in Quito filed an unprecedented injunction against Quito's then Mayor Santiago Guarderas, who proposed to relocate them outside the city's historic center to remote locations, which they perceived would have been detrimental for their work. Local judges initially ruled in their favor, and as of August 3, the plaintiffs were awaiting the municipality's decision whether to appeal the ruling. According to a spokesperson for the plaintiffs, transgender sex workers would be among those most affected by a possible relocation.

**Availability of Legal Gender Recognition:** The law prohibited changing gender on identity documents for LGBTQI+ persons younger than 18, even with parental consent. As of August 2, a decision remained pending in a case before the Constitutional Court to determine the age at which transgender underage individuals could change their identity information.

In May 2022, the Constitutional Court ruled the Office of the Civil Registry could change an individual's sex on record at the person's request without



EOIR — 62 of 172

requesting any additional documents. An LGBTQI+ organization reported that despite the ruling, there were cases in which the Office of the Civil Registry denied individuals their right to change their sex on record. The same organization also noted migrants were more vulnerable to the denial of this right. The court also ordered the National Assembly to "discuss and approve a bill to regulate the procedure for changing the sex of transgender persons." As of October, no bill had been approved.

**Involuntary or Coercive Medical or Psychological Practices:** An LGBTQI+ organization reported the existence of clandestine private treatment centers confining LGBTQI+ persons against their will to "cure" or "dehomosexualize" them despite the illegality of such treatment. LGBTQI+ organizations reported the practice persisted under the guise of religious or "wellness" retreats or drug addiction treatment centers. According to one LGBTQI+ organization, the government, with support from civil society organizations, had some success in identifying and closing such institutions. Another LGBTQI+ organization claimed the Attorney General's Office had not taken any action against the individuals who ran these establishments. There were no reports medically unnecessary and irreversible "normalization" surgeries were performed on children or on nonconsenting adult intersex persons.

According to human rights NGO Diálogo Diverso (Diverse Dialogue), many individuals confined to the "clinics" were afraid to report involuntary or

coercive practices because in most cases their family members forced them into the "treatments." The NGO reported that in 2022, 19 percent of young LGBTQI+ individuals reported being forced to receive "treatment" to change their gender identity or sexual orientation. LGBTQI+ organizations also reported relatives took LGBTQI+ persons to neighboring countries, where clinics reportedly used violent treatments, including rape, to attempt to change LGBTQI+ persons' sexual orientation. With support from civil society groups, the government established an interagency roundtable on May 10 to provide effective and coordinated responses to the dangers posed by these so-called clinics.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** In June, Guayaquil mayor Aquiles Álvarez did not approve a permit to allow the annual pride parade to pass through one of the city's main avenues as it had since 2000, claiming it would cause "great impact to traffic." Instead, the municipality offered secondary roads for the parade, which civil society organizations interpreted as a way of "hiding" LGBTQI+ individuals. Several LGBTQI+ organizations filed an injunction that led to a judge reversing the mayor's decision. Álvarez allowed the parade to take place as long as there was not any "disorderly conduct, no nudity, and no mockery."

## Persons with Disabilities

The law prohibited discrimination against persons with physical, sensory,

EOIR — 64 of 172

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (63 of 69)



intellectual, and mental disabilities. The law stipulated persons with disabilities had the right to health care and health insurance; to employment and job security; to education, including programs for scholarships and student loans; and to access buildings, transport, and communications. The government did not fully enforce the law.

By law, children with disabilities could attend specialized schools, but all educational establishments were required to accommodate students with disabilities. An advocacy NGO for persons with disabilities said nonspecialized institutions lacked the capacity and staff to accommodate the range of disabilities. The NGO said children with disabilities attended primary and secondary education at similar rates to other children, but they attended higher education at lower rates due to a lack of access to quality support and accessible infrastructure. According to the NGO, the lack of interagency coordination especially in the public sector hampered the possibility for persons with disabilities to transit smoothly from high school to universities or technical institutions and then to an independent life.

The law required that 4 percent of employees in all public and private enterprises with more than 25 employees be persons with disabilities, and it gave the Ombudsman's Office responsibility for following up on alleged violations of the rights of persons with disabilities, stipulating fines and punishments for lack of compliance. As of 2021, approximately one-half of enterprises complied with the law.

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB
RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (64 of 69)



## Other Societal Violence or Discrimination

Fundación Ecuatoriana Equidad said that although HIV-positive individuals were registered with the social security system, diagnosis, follow-up testing, and treatment continued to be inadequate due to mistreatment toward patients. The NGO said most HIV-positive individuals abandoned treatment due to discrimination from health-care providers.

Although Ministry of Labor regulations prohibited discrimination against hiring HIV-positive individuals and banned HIV tests as entry requirements for a job, LGBTQI+ organizations argued many employers continued requiring tests.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law, with exceptions, provided certain workers the right to form and join trade unions of their choice, to bargain collectively, and to strike. The law required a minimum of 30 workers for the creation of an association, work committee, or labor union, regardless of the total number of employees in the workplace. The law did not allow foreign citizens to serve as trade union officers.

EOIR — 66 of 172

The law prohibited the dismissal of union members from the moment a union notified the labor inspector of its general assembly. Employers were not required to reinstate workers fired for union activity but were required to pay such workers compensation and a fine of one year's annual salary for everyone wrongfully dismissed. Individual workers still employed could take complaints against employers to the Labor Inspection Office. Individuals no longer employed could take their complaints to courts charged with protecting labor rights. While courts upheld the right for sectoral unions to negotiate, the government failed to issue implementing regulations, thus preventing negotiations.

Unions could take complaints to a tripartite arbitration board established to hear their complaints. Despite the legal obligation to begin mediation within 48 hours of issuing a complaint, these procedures often were subject to lengthy delays because the Ministry of Labor lacked the skills and staff to address all arbitration requests and appeals. All private employers with unionized employees were legally required to negotiate collectively when the union so requested.

Ministerial resolutions allowed for the use of certain types of short-term or outsourcing labor contracts, with specific provisions for the flower, palm, fishing, livestock, and construction sectors. Unions alleged contracts could be used to undermine the right to organize. For example, employers could refuse to renew a short-term or temporary contract to a worker who was

attempting to organize a union, or they could outsource workers to prevent collective bargaining.

The right for workers to organize at a sectoral level was recognized by the courts but was not always implemented. In 2021, a provincial court ordered that the Ministry of Labor recognize the Trade Union Association of Agricultural Banana Workers and Peasants as a sector-wide union for banana workers, and the court tasked the Ombudsman's Office with monitoring the decision's implementation. This decision followed requests by the International Labor Organization to permit sector-wide union organizing in compliance with international labor standards.

The law provided for the right of private-sector employees to strike and conduct three-day solidarity strikes or boycotts on behalf of employees in other industries but only after multiple mandatory steps had been taken. The law established that before most strikes, collective labor disputes had to be referred to courts of conciliation and arbitration.

The law required a 10- to 20-day "cooling-off" period from the time a strike was declared before it could take effect. During this time, workers and employers had to agree on how many workers were needed to ensure a minimum level of service; at least 20 percent of the workforce had to continue to work to provide essential services. The law provided the employer could contract substitute personnel only when striking workers refused to send the number of workers required to provide the minimum

EOIR — 68 of 172

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB
RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (67 of 69)



necessary services. Contracting substitute personnel was effectively impossible, however, as the law did not provide for time-limited, seasonal, hourly, or part-time contracts.

The law prohibited formation of unions and restricted the right to collective bargaining and striking of public-sector workers in a long list of "strategic sectors," including environmental sanitation, education, justice, social security, electrical energy, hydrocarbon production, fuel processing, transport and distribution, public transportation, and postal service and telecommunications, which exceeded the International Labor Organization standard for essential services. Workers in these sectors attempting to strike could face charges with penalties of two to five years' imprisonment. The government effectively enforced the law on "strategic sectors."

All unions in the public sector fell under the Confederation of Public Servants. Although most public-sector workers also maintained membership in labor-sector associations, the law did not allow such associations to bargain collectively or to strike. The law specified that only the private sector could engage in collective bargaining.

The government did not effectively enforce all applicable law. Penalties were commensurate with those for other laws involving denial of civil rights, such as discrimination. Penalties were rarely applied against violators.

Employers did not always respect freedom of association and collective

EOIR — 69 of 172

bargaining, and labor rights advocacy groups said that influential business interests tied to local officials sometimes used criminal proceedings to restrict workers' right to unionize. Unions reported the Ministry of Labor delayed unions' requests to update their boards of directors, which led to delayed registration. Labor unions and associations reported difficulties and delays in registering unions in the ministry due to excessive and ever-changing requirements – sometimes not stated in the regulations – and ministry staff shortages.

There were several cases in which employers fired leaders of new unions while the unions were awaiting ministry registration. Even if a court supported a union's registration efforts, dismissed leaders were entitled only to compensation, not reinstatement, which undermined the union's ability to form. In addition, dismissed union leaders could not turn to the Ministry of Labor but had to go through the courts.

Independent union leaders alleged there were unions controlled by the government that received preferential treatment in administrative processes as well as invitations to roundtables to discuss labor policies.

## b. Prohibition of Forced or Compulsory Labor

See the Department of State's annual *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

Uploaded on: 10/18/2024 at 11:24:23 AM (Eastern Daylight Time) Base City: NYB RESTRICTED Case: 26-1233, 07/30/2026, DktEntry: 17.5, (69 of 69)



## c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

## d. Discrimination (see section 6)

## e. Acceptable Conditions of Work

**Wage and Hour Laws:** The law provided for a minimum monthly wage, which was above the poverty income level. The law limited the standard work period to 40 hours a week, eight hours a day, with two consecutive days of rest per week. Minors were limited to six hours a day and could work only one additional hour a day with premium pay. Overtime was limited to no more than four hours a day and a total of 12 hours a week. Mandatory overtime was prohibited. The law mandated prison terms for employers who did not register domestic workers with the Social Security Administration.

The law allowed employers and employees to enter into force majeure agreements, although the dismissal of an employee was permitted only if the business ceased operations permanently. The law also permitted employers to reduce working hours and salaries by up to 50 and 45 percent, respectively, by signing "emergency contracts" with their employees to



EOIR — 71 of 172